ACCEPTED
06-17-00226-CR
SIXTH COURT OF APPEALS
TEXARKANA, TEXAS
6/6/2018 1:33 PM
DEBBIE AUTREY
CLERK

**NO. 06-17-00226-CR**

IN THE COURT OF APPEALS
FOR THE SIXTH APPELLATE DISTRICT
AT TEXARKANA

FILED IN
6th COURT OF APPEALS
TEXARKANA, TEXAS
6/6/2018 1:33:58 PM
DEBBIE AUTREY
Clerk

**JUSTIN GEROME HORN**

**VS.**

**THE STATE OF TEXAS**

APPEALED FROM THE 124TH DISTRICT COURT, GREGG COUNTY, TEXAS
TRIAL CAUSE NO. 46,873-B

---

**BRIEF FOR JUSTIN GEROME HORN, APPELLANT**

---

Hough-Lewis ("Lew") Dunn
Attorney at Law
201 E. Methvin, Suite 102
P.O. Box 2226
Longview, TX 75606
Tel. 903-757-6711
Fax 903-757-6712
Email: dunn@texramp.net

***Appellant Respectfully Requests Oral Argument***

**STATEMENT REGARDING PARTIES TO THIS APPEAL**
[RULE 38.1(a) TEX.R.APP. PROC.]

Justin Gerome Horn, Appellant

Barrett Hunt
Attorney at Law
409 North Fredonia, Suite 122
Longview, TX 75601
Trial Counsel for Appellant

Chris Parker
V. Christopher Botto
Assistant Criminal District Attorneys
101 E. Methvin, Suite 333
Longview, TX 75601
Trial and Pre-Trial Counsel for the State

Hough-Lewis ("Lew") Dunn
Attorney at Law
P.O. Box 2226
Longview, TX 75606
Counsel for Appellant on Appeal
Texas State Bar No. 06244600

John Roberts
Assistant Criminal District Attorney
101 E. Methvin, Suite 333
Longview, TX 75601
Counsel for the State of Texas on Appeal

**TABLE OF CONTENTS**

PAGE

STATEMENT REGARDING PARTIES TO THIS APPEAL ...................... ii

TABLE OF CONTENTS ………………………………………………….. iii

TABLE OF AUTHORITIES ……………………………………………… vi

STATEMENT OF THE CASE ……………………………………………. viii

STATEMENT REGARDING ORAL ARGUMENT ……………………… viii

ISSUES PRESENTED …………………………………………………… ix

STATEMENT OF FACTS ……………………………………………….. 2

Waiver of Jury Trial …………………………………………………. 2

Trial and Punishment ……………………………………………………… 2

      State's Case in Chief ………………………………… 4

      Lt. Antonio Monsivais …………………………………… 4

      Dolorosa Welch …………………………………………… 8

      Appellant's Case in Chief ………………………………. 9

      Mary Davis ……………………………………………. 9

      Justin Gerome Horn ……………………………………… 10

PAGE

Argument ………………………………………………………..  13

Verdict ………………………………………………………..  13

Punishment  ……………………………………………………  14

SUMMARY OF THE ARGUMENT ……………………………………….  15

SOLE ISSUE, RESTATED …………………………………………….  15

THERE IS  LEGALLY INSUFFICIENT EVIDENCE TO PROVE APPELLANT
IS GULTY OF THE OFFENSE OF CREDIT CARD ABUSE

THE LAW  …………………………………………………….  15

Legal Sufficiency ………………………………………………..  15

Credit Card Abuse ………………………………………………  17

Trial to the Court ………………………………………………  18

ANALYSIS ……………………………………………………..  18

First Problem with the Evidence: the Photos ………..  23

Second Problem: No Labels During Interview ………….  26

Third Problem: Indistinct Images ……………………………  27

Fourth Problem: the Watch  …………………………………….  27

|  | PAGE |
|---|---|
| PRAYER FOR RELIEF …………………………………………………. | 31 |
| CERTIFICATE OF SERVICE ……………………………………….. | 32 |
| CERTIFICATE OF COMPLIANCE ………………………………….. | 33 |

# INDEX OF AUTHORITIES

CASES                                                                              PAGE

*Brooks v. State*, 323 S.W.3d 893 (Tex. Crim. App. 2010) …………………………    16

*Carmouche v. State*, 10 S.W.3d 323 (Tex. Crim. App. 2000) ……………………    29, 30

*Clinton v. State*, 354 S.W.3d 795 (Tex. Crim. App. 2011) …………………………    18

*Hooper v. State*, 214 S.W.3d 9 (Tex. Crim. App. 2007) ………………………..    16, 30, 31

*In re Winship*, 397 U.S. 358 (1970) ……………………………………………………….    15

*Jackson v. Virginia*, 443 U.S. 307 (1979) ……………………………………………….    15, 16

*Johnson v. State*, 571 S.W.2d 170 (Tex. Crim. App. 1978) ………………………    18

*Malik v. State*, 953 S.W.2d 234 (Tex. Crim. App. 19970 …………………………    16

*Tate v. State*, 500 S.W.3d 410 (Tex. Crim. App. 2016) …………………………..    16

*Webb v. State,* 278 S.W.2d 158 (Tex. Crim. App. 1955) …………………………..    16

W*ilson v. State*, 536 S.W.2d 375 (Tex. Crim. App. 1976) ………………………    15

*Winfrey v. State*, 393 S.W.3d 763 (Tex. Crim. App. 2013) ……………………    16

STATUTES AND RULES

U.S. CONST.

    Fourteenth Amendment ………………………………………………………….    15, 16

STATUTES AND RULES                                                    PAGE

TEX. CONST.

art. 1, §19,Art. 1, §19 ……………………………………………………………. 15

TEX. CODE CRIM. PROC.

Art. 1.04 ……………………………………………………………………… 15

TEX. PENAL CODE

§32.31 ……………………………………………………………………………… 17

References to statutes are to the version of Vernon's Annotated Statutes current for the dates of the offense and trial herein.

## STATEMENT OF THE CASE

On July 27, 2017, Justin Gerome Horn was indicted for credit card abuse (CR 4). On October 6, 2017, Horn waived his right to a jury trial (2 RR 4-6). On December 4, 2017, Appellant pleaded not guilty, and evidence was taken by the Court (3 RR 13). The State presented evidence by live testimony and a series of exhibits and rested (3 RR 45). Appellant offered his witnesses (3 RR 46 and 50). After arguments by counsel, the trial court found Appellant guilty (3 RR 69). At the punishment phase no evidence was offered other than the PSI (3 RR 71). The trial court assessed a sentence of 14 months in the State Jail division of TDCJ (3 RR 74; CR 38). The motion for new trial was overruled as a matter of law, and this appeal came forward.

## STATEMENT REGARDING ORAL ARGUMENT

Because of the legal complexities of this case, oral argument should be granted to enable the parties to present their positions to the Court to clarify the sole issue.

## ISSUES PRESENTED

**SOLE ISSUE**: THERE IS LEGALLY INSUFFICIENT EVIDENCE TO PROVE APPELLANT IS GUILTY OF THE OFFENSE OF CREDIT CARD ABUSE

ix

**NO. 06-17-00226-CR**

IN THE COURT OF APPEALS
FOR THE SIXTH APPELLATE DISTRICT
AT TEXARKANA

---

**JUSTIN GEROME HORN**

**VS.**

**THE STATE OF TEXAS**

APPEALED FROM THE 124TH DISTRICT COURT, GREGG COUNTY, TEXAS
TRIAL CAUSE NO. 46,873-B

---

**BRIEF FOR JUSTIN GEROME HORN, APPELLANT**

---

TO THE HONORABLE JUSTICES OF THE SIXTH COURT OF APPEALS:

COMES NOW JUSTIN GEROME HORN, Appellant, on appeal in Cause No. 46,873-B from the Judgment of Conviction entered by the District Court for the 124TH Judicial District of Gregg County, Texas, wherein, on his plea of not guilty (having waived his right to jury trial), the case was tried to the court, and Appellant was found guilty of the offense of credit card abuse and sentenced to a term of fourteen (14) months imprisonment in the Texas Department of Criminal Justice, State Jail Division, the Honorable Alfonso Charles presiding at trial and sentencing, in which Appellant was Defendant, and in which The State of Texas was

1

plaintiff and is now Appellee.

# STATEMENT OF FACTS

Waiver of Jury Trial

On October 6, 2017, Appellant appeared in open court with counsel (2 RR 4). The trial court admonished him about his rights to a jury trial and the consequences of the waiver (2 RR 5-6; signed waiver at CR 10). Appellant was firm in his decision to waive his right to a jury trial. *(Id.)*

Trial and Punishment

On December 4, 2017, trial convened to the court sitting without a jury (3 RR 7). Since Appellant was dissatisfied with his trial counsel, the trial court heard from Appellant about why he wanted another attorney. Appellant stated that he felt like trial counsel had not "done enough to prepare with you for this case"; and that, according to Appellant, "we haven't had a chance to talk about this case clear enough for me – to me, to understand what's going on. Because I still don't know what's going on. It's been messed up from the start" (3 RR 8). Trial counsel confirmed with Appellant that the two had spoken the day before on the telephone and went over what was going to occur at trial; that they talked about

the questions and what would happen throughout the entire trial (3 RR 8-9). The trial court denied the request for another counsel (3 RR 9).

Next, the trial court inquired about discovery between the parties (3 RR 10). There was one exception to the statement by the State that all photographs had been furnished. According to Appellant, there was another photo that was shown to him by the detective that was not provided (3 RR 11). The trial court found that the State had complied with discovery based upon the representations of State's counsel and the statements of the officer (3 RR 12). Counsel for Appellant stated that he would inquire into this on cross-examination. (*Id.*)

The indictment (CR 4) was then read; Appellant entered his plea of "not guilty" (3 RR 12-13). The trial court then told Appellant that "we're getting ready to go to trial," to which he then asked, "So is it by jury?" At that point the trial court reminded Appellant that he had waived his right to a jury trial back in October (3 RR 13). The trial court went over the fact of the waiver of jury trial and asked Appellant if he understood; he acknowledged that he did, and that "I just want to be treated fairly" (3 RR 14). The trial court replied that he intended to treat him fairly (*id.*).

After a brief recess, the witnesses were duly sworn, and counsel for Appellant offered his opening statement, saying that the case was one of mistaken identity (3 RR 15-16).

State's Case-in-Chief

Lt. Antonio Monsivais

The State's first witness was Lt. Antonio Monsivais (3 RR 16). He investigated a credit card abuse case that was reported by Dolorosa Welch; she filed a complaint that someone had used her credit card without her authorization (3 RR 17). According to Lt. Monsivais, Ms. Welch reported that her credit card had been used at two stores in Longview: Walgreens on the Loop and Kroger's on the Spur. He went to the stores to see if he could obtain video and receipts of the transactions (*id*.).

The date of the Walgreens transaction was July 19, 2016; the card's last four numbers were "6379," a credit card (3 RR 18). At Walgreens Lt. Monsivais obtained video and a receipt (*id*.)

The State then offered its Exhibits 1 through 6; they were admitted into evidence without objection (3 RR 18-19). State's Exhibit #7 was also offered and received without objection: a copy of the video from Walmart (3 RR 19-20).

4

From the videos Lt. Monsivais made some still photographs; State's Exhibit #8 was one of those pictures; it was offered and admitted into evidence without objection (3 RR 20-21). Then State's #9 was offered and admitted into evidence without objection, the receipt from Walgreens (3 RR 21).

Lt. Monsivais then related how he and the manager of Walgreens got together and reviewed the date and times that Lt. Monsivais had gotten from Ms. Welch, and the manager pulled up the time when the person checked out; Lt. Monsivais had the receipt from Ms. Welch which had a time on it; and he went back to the security camera to find out who was using the card at that transaction time (3 RR 22).

Lt. Monsivais then identified State's Exhibits 1, 2, and 3 as actual still photographs from the Walgreens video (3 RR 23). Next, Counsel for the State played the video from Walgreens (State's # 7) (3 RR 23-24.) Then the witness testified as to where the person on the video was at various times on the video, eventually coming up to register number two at 18:19 and 18:20 checking out (3 RR 24-25). He described the items purchased as a "Vanilla Visa" with a value of $200 – a prepaid card -- and a few other items (3 RR 25)

Lt. Monsivais stated that Kroger's was not very cooperative in the investigation (3 RR 26). He then stated that Ms. Welch told him that she did not know who took the card or who had it (*id.*).

To try to determine who the person was, he posted either the video or some of the photographs on the Gregg County web page (he did not recall which) (*id.*). Lt. Monsivais was told by a Longview police officer that the individual in the video or photographs looked like Appellant (3 RR 26-27). Since Appellant was then in jail, Lt. Monsivais interviewed him there (3 RR 27).

The State then referred the witness to State's # 10 and # 11; a picture of a watch and the interview with Appellant, respectively (3 RR 27). The picture of the watch, according to the witness, resembled a "large face watch" seen in the photographs from Kroger and Walgreens (3 RR 27-28). Appellant had a similar watch in his property at the jail (3 RR 28).

The State then, without objection, offered State's #10, #11, and #12[1] into evidence, and they were admitted (3 RR 28-29). Lt. Monsivais then testified that he showed some of the pictures to Appellant during the interview, and that initially -- when he showed some of the pictures to Appellant -- Appellant said that one of the pictures was of himself (State's #1) or that "that looks like me" (State's

---

[1] Copy of Miranda warnings administered to Appellant.

6

#2); but later in the interview (said Lt. Monsivais) Appellant changed his mind about the pictures, stating that were not of him (3 RR 32-33).

On cross-examination Lt. Monsivais stated that those were all of the photographs he had shown to Appellant; that there were no pictures with Appellant wearing white shorts (3 RR 33). Lt. Monsivais said that he did not pay any attention to whether the person walking into Walgreens was bowlegged; he could not tell how tall the individual was; that State's #1 was "a pretty blurry photo"; that State's # 2 was "grainy" as was State's #3 (3 RR 35). According to the witness, when shown State's #1, Appellant said, "That's me" (*id*.). As to the watch, Lt. Monsivais admitted that wearing a watch is a common occurrence (3 RR 36). According to the witness, the individual seen in the photos was wearing sandals that day, but Appellant was pretty adamant that he did not wear sandals, and that was one way he was able to clarify that the individual in the photos was not him (*id*.). Furthermore, (stated Lt. Monsivais) the individual in the photos wore green-tinted shorts, but Appellant was adamant upon looking at the pictures, that he did not own any green shorts (3 RR 37). Even after looking at the video in open court, Lt. Monsivais – asked if the individual walking in would be "fairly bowlegged" – stated: "Doesn't appear [so] to me" (*id*.).

On further questioning, Lt. Monsivais stated that the only time Appellant told him that he used a credit card was when he was together with someone called Ms. Strickland (*id*.).

On re-direct examination Lt. Monsivais further testified that he had turned over all of the materials from his investigation to the District Attorney's office, including hand-written notes (3 RR 38).

Dolorosa Welch

Dolorosa testified that she had a credit card from Chase bank, the last four digits being 6379. State's counsel marked as State's #13 some materials she had received from Chase relating to the use of the credit card, and placed it into evidence without objection (3 RR 41-42). Ms. Welch testified that, at the time of the offense, her credit card was expiring and she was supposed to receive a new one; however, she never received it (3 RR 42). She believed that someone intercepted the card (*id.*). She received a fraud alert from Chase on July 23, 2016; she contacted Chase and was informed of the transaction at Walgreen for $220.80; she passed this on to the investigator (3 RR 43). Ms. Welch never gave permission to Appellant to use the credit card; she did not know Appellant. As to the person who was identified to her in open court as Appellant: she stated that she did not know him and that she never consented for him to use the credit card;

8

nor did she ever consent to anyone else to use it (3 RR 44). Then she was asked: "You were the only person to use your credit card?" and she answered, "I'm the only one" (*id.*).

That concluded the State's evidence. Counsel for Appellant requested a directed verdict, stating," …I'd ask for a directed verdict; that the State did not meet all their evidence – did not meet all their elements. Mainly, I do not believe the State identified the defendant." The motion was overruled, with the trial court stating, "I believe the defendant has been identified." (3 RR 45).

<u>Appellant's Case-in-Chief</u>

<u>Mary Davis</u>

Mary Davis is the mother of Appellant (3 RR 46). Ms. Davis testified that her son does not wear sandals, that he had never worn sandals, that they were one thing he did not wear. He wore sneakers or Sperry loafer-like shoes, but she had never seen him wear sandals; that he had lived with her for some time and she never saw him wear sandals (3 RR 47). She also stated that she or his sister drove Appellant where he needed to go or that his girlfriend Erma would drive him; that she (Ms. Davis) drove a black Kia Forte; that his sister drove a green Toyota Camry (3 RR 47-48).

Ms. Davis further stated that Appellant mostly paid for things by cash, that he was not established enough to get a credit card (3 RR 48). On cross-examination Ms. Davis stated that Appellant would use his girlfriend's (Erma Strickland's) credit card sometimes (3 RR 49).

Justin Gerome Horn

Appellant took the witness stand in his own defense (3 RR 50). He testified that he did not have a driver's license, that it was suspended, and that his mother or Ms. Strickland would drive him; his mother drove a Black Kia Forte, and Ms. Strickland drove a black Pontiac G6 (3 RR 51). He drove with his mother on her insurance route and also drove with her when he was looking for work (3 RR 52). When he drove with Ms. Strickland, it was perhaps to get something to eat or go to a park or convenience store to get something to drink (*id.*). When he drove around with Ms. Strickland, he would pay for things by using her credit card: a Telco card and a Bank of America card; he would return the card to her when he finished using it; other times she would have cash (*id.*).

Appellant denied that he had ever gone to Krogers or Walgreens with Ms. Strickland (3 RR 53). He did not know anyone with a silver car (*id.*). On the date in question – July 19, 2016 – he stated that he was not working; during the day he would typically be with his mother or Ms. Strickland (*id.*).

10

On July 19, 2016, he was confined to the Marvin A. Smith unit of the Gregg County jail, and two detectives came in to talk with him (*id*.). He stated that when he was told that they wanted to speak to him about credit card abuse, he decided to talk to them because his Facebook page had been hacked, and he wanted to hear what they had to say (3 RR 54).

The detectives asked him about credit cards and showed him a stack of photos, maybe 10 or 12 of them. The detective showed him "one particular picture, and it caught my eye because the guy had on khaki shorts and a white T-shirt. And I have a pair of khaki shorts that was, like, similar to those in the picture. And that's what caught my eye. And I told him that might be me right there. Because I wanted to be honest with him, you now, to help him with this case, get it narrowed down, so he can find the right victim (sic). " (3 RR 54-55). Then (a few lines later in the record) Appellant testified:

"He showed me some pictures of a gentleman with some green shorts on and a plaid shirt and some sandals. And that's when I told him, 'Look, I don't -- I don't wear any sandals,' you know." (3 RR 55).

Trial counsel came back to the picture of someone wearing a white shirt and khaki shorts, and Appellant stated, " I have, like, three pictures on my Facebook

11

right now on my page with those – I have – I have on the khaki shorts and the white short – white T-shirt….and I don't see it today." (*id*.).

Trial counsel then showed State's Exhibits 1 through 6 to Appellant and asked him to take a look at them, asking him were there additional pictures that the detective showed him that day, and Appellant stated that there were more than this (3 RR 55-56). On questioning from his counsel, Appellant insisted that one of the missing pictures was "potentially" of himself, described as follows: "He had on khaki shorts, and it was a side view of the shorts, he was standing sideways." (3 RR 56). Appellant repeated the fact that on his Facebook page he had pictures of himself wearing khaki shorts, and that those were similar to the one shown to him by the detectives that day; Appellant also repeated that the individual -- in the pictures offered by the State -- is wearing sandals, and that he did not wear sandals, that he did not like them on his feet (*id*.). He stressed that he had not worn sandals since he "was a kid" (3 RR 57). Appellant stated that he had tattoos on his arms and on his lower right wrist, and had had them for six to ten years (*id*.).

Later Appellant stated that the photo that he had identified as himself was not in court at trial (3 RR 63).

<u>Argument</u>

The State argued that the photographic evidence was sufficient to prove the case beyond a reasonable doubt. He also pointed to the presence of the watch as "unique"; he argued that Appellant's memory had gotten worse, and the State argued that the interview was a significant piece of evidence" and argued for a conviction (3 RR 65-66).

Trial Counsel argued that it was a case of mistaken identity. He stated that Appellant was initially cooperative because he believed he was a victim of stolen identity; that the photo that Appellant believed was of himself has not been produced, and that the photos were not of the clearest resolution; but as Appellant looked closer at the photos, he noticed details – like the sandals – that indicated that the person in the photos was not him; that the watch was not unique but, contrarily, very common; that there was no other evidence linking him to using the credit card; that Appellant did not use credit cards unless those of Ms. Strickland; that it was a case of mistaken identity (3 RR 66-68).

<u>Verdict</u>

After a recess the trial court announced his verdict. He stated that certain elements of the offense were not contested, and that the issue was one of identity; the trial court stated (from listening to the audio interview) that although

initially Appellant identified himself in the first picture shown to him, that "it sounds like when he realizes he could be in trouble, all of sudden he changes that it's not him anymore"; the trial court stated that Appellant "put at issue credibility," because Appellant stated that a picture was missing which he had identified as himself, but that Lt. Monsivais had testified that all of the pictures were in evidence; the trial court stated that evidence of the watch – while "probably several – maybe several thousand here in Gregg County" – that "when you have the defendant in a photograph identifying himself, and then also that watch or a watch very similar plainly visible in the transactions or the offense being committed," all of this led him to find Appellant guilty beyond a reasonable doubt" (3 RR 69-70).

Punishment

The State asked the Court to take judicial notice of the Presentence Investigation and rested. No evidence was offered by Appellant (3 RR 71).

Trial counsel for Appellant requested probation (3 RR 72).

The State requested a sentence of 18 months state jail (3 RR 73).

After a recess the trial court pronounced sentence at 14 months in state jail (3 RR 75). Counsel for appeal was then appointed (3 RR 77).

On January 4, 2018, a hearing was held to set an appeal bond (4 RR 4 ff). After the trial court heard testimony, the appeal bond was set at $7,500 (4 RR 17). However, at this writing, Appellant has been unable to post that bond. This appeal came forward.

**SUMMARY OF THE ARGUMENT**

THE EVIDENCE IS INSUFFICIENT TO PROVE THE ELEMENT OF IDENTITY, SINCE THERE ARE INCONSISTENCIES IN THE STATE'S CIRCUMSTANTIAL EVIDENCE WHICH DEMONSTRATE THAT SOMEONE OTHER THAN APPELLANT WAS THE OFFENDER.

**ARGUMENT AND AUTHORITIES**

**SOLE ISSUE, RESTATED**

THERE IS LEGALLY INSUFFICIENT EVIDENCE TO PROVE APPELLANT IS GUILTY OF THE OFFENSE OF CREDIT CARD ABUSE

THE LAW

Legal Sufficiency

The State's burden is to prove each and every element alleged beyond a reasonable doubt. *See*, Due Course of the Law provision, TEX. CONST., art. 1, § 19, and TEX. CODE CRIM. P., Art. 1.04; W*ilson v. State*, 536 S.W.2d 375, at 377 (Tex. Crim. App. 1976) (state law). Federal argument rests in due process rights as guaranteed under U.S.CONST. amend. XIV; *see Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *In re Winship*, 397 U.S. 358 (1970). The Texas Constitution provision

has been held analogous to Fourteenth Amendment Due Process. *See, Webb v. State,* 278 S.W.2d 158, 160 (Tex. Crim. App. 1955). Under legal sufficiency, all the evidence is reviewed in the light most favorable to the jury's verdict to determine whether or not any rational jury could have found the essential elements of the crime beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). Review focuses on quality of evidence p r e s e n t e d . *Brooks*, 323 S.W.3d at 917-918 (Cochran, J., concurring). As to legal sufficiency under *Brooks*, deference is made to the responsibility of the jury to "fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)(citing *Jackson*, 443 U.S. at 318-19). Legal sufficiency of the evidence is measured by the elements of the offense, defined by hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).

It has been held that in a sufficiency inquiry, direct and circumstantial evidence are equally probative. *Tate v. State*, 500 S.W.3d 410, 413 (Tex. Crim. App. 2016) (citing to *Winfrey v. State*, 393 S.W.3d 763, 771 (Tex. Crim. App. 2013). In *Hooper v. State*, at 16, the Court of Criminal Appeals made the following observation about different types of conclusions drawn from evidence:

To correctly apply the *Jackson* standard, it is vital that courts of appeal understand the difference between a reasonable inference supported by the evidence at trial, speculation, and a presumption. A presumption is a legal inference that a fact exists if the facts giving rise to the presumption are proven beyond a reasonable doubt. *See* TEX. PENAL CODE § 2.05. For example, the Penal Code states that a person who purchases or receives a used or secondhand motor vehicle is presumed to know on receipt that the vehicle has been previously stolen, if certain basic facts are established regarding his conduct after receiving the vehicle. TEX. PENAL CODE § 31.03(c)(7). A jury may find that the element of the offense sought to be presumed exists, but it is not bound to find so. TEX. PENAL CODE § 2.05. In contrast, an inference is a conclusion reached by considering other facts and deducing a logical consequence from them. Speculation is mere theorizing or guessing about the possible meaning of facts and evidence presented. A conclusion reached by speculation may not be completely unreasonable, but it is not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt.

Credit Card Abuse

The statute under which Appellant was charged was this: §32.31, TEX. PENAL CODE. The elements of the offense are these:

a person,

with intent to obtain a benefit fraudulently,

presents or uses a credit card or debit card,

with knowledge

that the card has not been issued to him, and

is not used with the consent of the cardholder.

17

*See, Clinton v. State*, 354 S.W.3d 795, 800 (Tex. Crim. App. 2011).

Trial to the Court

It has been written that "the trial judge in a trial before the court, is the sole judge of the credibility of the witnesses and may accept or reject any part of the testimony of the State or defense witnesses." *Johnson v. State*, 571 S.W.2d 170, 173 (Tex. Crim. App. 1978).

ANALYSIS

The case at bar has evidence that someone used the credit card belonging to the victim to purchase items at a Walgreens store and at a Kroger store (see State's Ex. #9, the Walgreens receipt, 3 RR 21). The victim testified that the credit card used was her credit card (3 RR 41-42). She did not consent to anyone making those purchases (3 RR 44). What she did state was that she never received a new credit card that had been sent to her, and she believed that someone had intercepted the card (3 RR 42). The victim told the investigating detective that she did not know who had taken her credit card (3 RR 26).

There was no evidence to show that Appellant was the one who intercepted the credit card in order to gain its possession. Appellant did not admit to the use of the victim's credit card. There was, therefore, no evidence to link Appellant to the credit card and its use other than whatever circumstantial evidence the State might want to place into evidence. At the close of the State's evidence, trial counsel for Appellant moved for a directed verdict, arguing that the element of identity was not proven (3 RR 45). That same argument was made in Appellant's opening statement (3 RR 15-16) and in closing argument (3 RR 66-68).

Crucial to the State's case – the trial court specifically referred to it (3 RR 69-70) when he made his ruling on guilt/innocence – was the audio recording of the interview of Appellant, State's Exhibit # 11. Absent that piece of evidence, the State's proof of identity would be seriously undermined.

So what are the sufficiency problems with State's Exhibit # 11 and the photographic exhibits (State's 1-4) that derive from it?

First of all, it is an audio tape, not a video. The Code of Criminal Procedure evidently permits an electronic recording of a statement of someone in custody, yet in its enumeration of those sorts of recordings does not expressly permit an audio recording; the statute does list "motion picture, video tape, or other visual

recording. Art. 38.22, Sec. 3(a)(1), TEX. CODE CRIM. PROC. [2]   Secondly, even without an objection to the evidence, there still exist some stark problems with the methodology and impact of this audio tape as opposed to a video tape. Those problems center around such issues as demeanor of Appellant during the questioning, the position and gestures of the interrogator *vis a vis* Appellant, and perhaps most importantly, the photographs: there is no visual record of what images were shown to Appellant.

At first one hears a cooperative voice from Appellant when the officers speak to him – he had been the victim of someone hacking into his Facebook page, and was hoping that this was something to do with that (3 RR 54). Even though the conversation – from the point of view of Lt. Monsivais – from the very first was designed to see if Appellant would incriminate himself in the misuse of the credit card [one might listen, for instance, to the questions posed at (minute and second) 2:15, 3:00, 4:49, 5:00, 5:24, 5:48, 5:54] -- all questions directed at Appellant to see if he used a credit card on the date in question and where he was when he used it], Appellant's responses were factual as best he could recall, saying that he sometimes used the credit cards of his girlfriend, Erma – a Bank of America card and a Telco card, but only with her permission. Then at minute number six (6) the

---

[2] Regrettably, there was no motion filed to suppress the recording; there was no objection to its introduction at trial.

detective tells Appellant that, when the video and photos were seen by other people, Appellant's name came up. Appellant then tries the recall the last time he used Erma's card, but cannot (6:24-25). Appellant tries to recall what he was doing on the date in question, and says, "Let me think" (6:58), after which there is a pause until the detective (at 7:22) asks why Appellant is in the jail. Appellant tells him "fines, court fines" (7:26).

Then the conversation develops some more, as the detective tells Appellant that there are (paraphrasing) …. things I have, things I know that I need you to clarify for me (8:00-03); he encourages Appellant to "be straight with me" (8:08). Appellant replies that he understood, but that he could not recall what they bought or where they were, that he recalled that they made a lot of random stops (8:18-30). Appellant said that Erma drove a black Pontiac (8:37) and that he did not have a car. When asked why people would give the detective Appellant's name, Appellant said, "I could pop up…I don't know…I don't own a gray car" (9:50-52).

Finally, Lt. Monsivais tells Appellant that he was seen on surveillance video using a stolen credit card (10:00 ff.). Sounding surprised, Appellant wonders "you've got me on tape using stolen credit cards?" (10:17-19). When asked if he would like to see pictures, Appellant states that he would, "because I didn't use no stolen credit card" (10:21-25). Still thinking that this concerns the use of Erma's

credit cards, Appellant tells the detective to check with her and gives him her work hours (10:48-59). Then the detective tells Appellant, "We don't have Erma on video; we have you" (11:00). Then the investigator shows Appellant a picture (not identified in the audio tape as any particular photo) and asks him, "Who's this?" and Appellant replies, "That's me" (11:14-19). The investigator refers to the "big ol' watch" seen in the picture (11:22 ff). Then the investigator tells Appellant that "Erma may be playing you," to which Appellant replies that "she wouldn't do me like that" (12:00 ff). Then the investigator – evidently pointing to some picture – says, "But that's you" and Appellant says, "Yeah, right" (12:08-10). The audio tape is silent as to which picture was shown. Once again the detective asks Appellant whether he remembered anything, and Appellant says "Nope" (12:24-26). Then again (with no description of what photo is being shown) the detective says, "But it is you, right?" and Appellant says "Yes, sir" (12:29-31).

Asked once more if that was he using the credit card, Appellant does not reply (12:33-35). At that point Appellant begins making some observations about how the person in the pictures is not him: he owns no green shorts (13:05, 13:11, 14:47), just a pair of brown khaki shorts (13:21), that he had a black and gold watch (13:24, 13:33), and denying that the photos showed him (13:46, 13:56-57), that he does not own sandals (14:00 ff.) and does not own open-toed sandals

(14:30 ff, 14:38). Then at the fifteenth minute Appellant requests an attorney (15:00-05), at which point the interview ends.

Several things undermine the sufficiency of the evidence, as one considers what was heard during that interview, what was later told in court, and the photographs introduced into evidence.

First Problem with the Evidence: the Photos

First: Appellant was certain in court that he was shown a picture of a man wearing khaki shorts and a tee shirt (3 RR 54-55). During the interview Appellant tells Lt. Monsivais, "I have a pair of brown khaki shorts." That assertion is quite important, because it is not made after the fact but at the time of the interview. It substantiates Appellant's later assertion in court that, indeed, he was shown a photograph of himself in brown khaki shorts, and that picture is not among the State's exhibits. It fits Appellant's narrative of events, because he very well could have said, "That's me," if he was being shown a photo of a man in a white tee shirt and khaki shorts. That photograph is one that does NOT fit the State's narrative, and that raises the very real possibility that the State's witness somehow wound up in court without that photograph.

A close look at the evidence supports that position. Under cross-examination, there was this exchange between Lt. Monsivais and Appellant's counsel on cross-examination:

Q     Lieutenant Monsivais, in investigating this case, the photos you've – the photos that you showed Mr. Horn, is that all of the photos that you have – that you have?

A     Yes, I -- yes. And I marked them.

Q     So there – would there – could there have been any other photos?

A     No, sir.

Q     So there were no pictures with him wearing white shorts or anything?

A     No.

(3 RR 33)

A couple of things are important in the exchange. First, the question should be not whether there was a picture of Appellant wearing **white** shorts, but **khaki** shorts. So there was no dishonesty in answering the question as it was asked. Second, the initial question is phrased in the present tense, not the past tense. Again, Lt. Monsivais could truthfully reply that that was all of the pictures he has – that is, today, in open court, at the time of the trial.

24

The other question and answer seem a little more complex, when the witness was asked, "So there – would there – could there have been any other photos?" It would be truthful to reply, "No, sir" if the witness means by that, that no other still photographs were made off the Walgreens or Kroger videos, since all of the ones offered in open court appear to have come from either of the two stores.

Yet, to explain the conundrum of reconciling both Lt. Monsivais' version and Appellant's, what if the Lieutenant had some other photograph of Appellant, one taken from his Facebook page? What if, in fact, it was shown to Appellant as the picture to which he says, "That's me" ? Appellant speaks twice of having such pictures of himself on his FaceBook page (3 RR 55, 56), two or three pictures showing him **wearing a white tee shirt and khaki shorts**. The record supports such a scenario, and the witness need not have necessarily been telling a falsehood in his answers to the questions. It's just that **the witness was never asked the direct question: "Did you, at the time of the interview, show a picture to Appellant that showed him wearing a white tee short and khaki shorts?"** That question was never asked. In hindsight it should have been, but it was not. With no video of the interview and no ability externally to verify what precise photo was shown to Appellant, the audio tape record in fact could support either narrative. On behalf

of Appellant, his narrative makes more sense. It makes no sense to see a picture of someone in a plaid shirt, green shorts, and sandals, and say, "That's me"; Appellant disavowed owning green shorts and said he never wore sandals. However, It does make sense to see oneself wearing a white tee shirt and khaki shorts and say, "That's me," if in fact you do wear such clothes and have several pictures on FaceBook of that, and if, during the questioning from the detective you tell him, "I have a pair of brown khaki shorts."

Second Problem: No Labels During Interview

Second: there is no record during the audio tape of what picture was shown to Appellant, other than what Appellant states or that one can infer from what he states: first, that he had brown khaki shorts – like the man in the (now missing) picture; second, that he did not own green shorts, and third, that he did not own sandals. As the audio tape unwinds, there is never any reference by Lt. Monsivais (as he hands a photo to Appellant) to a picture as "TM-1," "TM-2," "TM-3," etc., although by the time of trial those markings appear on the photos. But none of those are of Appellant in a white tee shirt and khaki shorts. Maybe the photo just got left out of the eventual assemblage, inadvertently and not intentionally, and only later the photos were given their respective initials and numbers, especially since from the outset they are not identified. This Court is invited to listen carefully

26

to the audio tape and note that there are no words like, "OK, I am marking this photo TM-1 and handing it to Mr. Horn." There is nothing like that. There is nothing at the outset of the interview where Lt. Monsivais says, something like, "For the purpose of this interview, I am marking an array of photographs taken from the videos; I am marking them TM-1, TM-2 etc." Similarly, there is nothing at the conclusion of the interview to indicate that any sort of labeling of the photos was made.

Third Problem: Indistinct Images

Third, the still photos taken from the video are indistinct, lacking the definition that would make distinctive facial features readily apparent. Lt. Monsivais concedes this during cross-examination, using words like "blurry" and "grainy" (3 RR 34, line 23 through p. 35, line 12). Surely, that is not proof of identity beyond a reasonable doubt.

Fourth Problem: the Watch

Fourth, and as important as any of the foregoing – maybe more so -- , is the watch. The State went to some lengths to try to make its identification of Appellant by means of the watch that was in his property at the jail. *See*, State's Exhibits #10, two pictures of Appellant's watch: a large silver and gold face dial, with black straps, accented by some small silver pieces. It would be quite

problematic at best to say that **the still photographs** from the video at Walgreens showed Appellant's watch. The images are simply too vague in their detail. What is not vague or indistinct is what is seen **in the Walgreens video** of the man walking into the store, approaching the checkout counter, paying for the items, and leaving. State's Ex. # 7 shows the man enter the store at (hour, minute, second) 18:14:54, only to disappear from sight.

Following is what happened when he next appeared:

| TIME | EVENT |
|------|-------|
| | (View of Register) |
| 18:16:45 | Man emerges from aisle on right, gets another item |
| 18:16:58 | Man gets in line behind several others to check out |
| 18:17:17 | Man is visible in line, with a watch with a **silver or white band visible on left wrist** |
| 18:19:10 | Man steps to register, with same watch visible |
| 18:19:50 | Man checks out, with same watch visible |
| 18:20:30 | Man exits from view of register |
| | (View of Front Door) |
| 18:20:29 | Man walks to door, same watch prominently displayed |
| 18:20:30 | Man walks to door, same watch prominently displayed |

18:20:31          Man walks out door, same watch prominently displayed

18:20:33-34       Man seen walking outside the store, same watch prominently
                  displayed

In short, that video is conclusive that the watch worn by the man in the

video is NOT Appellant's watch, with its black band. There is not a doubt

that the watches are different.

Interestingly – and weighing against the State --  in his summation, State's

counsel conceded that the photographic evidence "**appears to be** of the

defendant" (evidence supplied), placing its probative effect on a level that falls

below that of evidence beyond a reasonable doubt; State's Counsel placed

emphasis on the watch as identifying Appellant, saying it was "unique" (3 RR 65).

Yet the video shows something very different and to the contrary. The trial court

seemed to rely upon the evidence of the watch in concluding that the State had

made its case on identity, saying "…that watch or a watch very similar plainly

visible in the transactions or the offense being committed…" (3 RR 70). By making

that reliance, the trial court erred. The video evidence is to the contrary.

There is precedent that on appeal, when video evidence contradicts the

finding in the lower court,  the reviewing court may conclude that the court erred

in its finding. *See, Carmouche v. State*, 10 S.W.3d 323, 332 (Tex. Crim. App. 2000).

In *Carmouche* "indisputable video evidence" contradicted parts of a witness' testimony and therefore could not have upheld the conclusion reached by the lower court.

The case at bar fits the *Carmouche* profile. There is indisputable video evidence that the man in the video – hence, in the photographs – was NOT wearing a watch like the one owned by Appellant. The trial court erred in concluding from that, that the individual was Appellant. It most certainly was not him. That big difference sets off a cascading effect, like a row of dominos, to support Appellant's assertion that he was not the man in the photos that the State offered into evidence, and it further supports Appellant's version of the facts that he was shown some other picture of himself wearing a tee shirt and khaki shorts. In other words, when the State's evidence fails in the crucial aspect of the watch, its probative value in the other respects is also subject to attack, and reasonable doubt is shown.

Finally, the evidence is no longer based upon a "reasonable inference" but, rather, has fallen into the category of evidence founded upon speculation. As stated earlier in this Brief (quoting from the *Hooper* decision, *supra*, p. 17):

"Speculation is mere theorizing or guessing about the possible meaning of facts and evidence presented. **A conclusion reached by speculation may not be completely unreasonable, but it is not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt."** *Hooper v. State*, 214 S.W.3d at 16 (emphasis supplied). Why speculation? The pictures are grainy and blurry; no contemporaneous numbering of the photographs is heard in the audio tape record; the watch is not Appellant's watch: the video tape contradicts the conclusion drawn by the trial court and State's counsel concerning the watch; the clothing is wrong; there is a mysteriously missing picture whose presence would explain a lot of things. To base a conviction on such facts veers off into speculation.

The evidence is legally insufficient. The judgment of conviction should be reversed and remanded with an acquittal.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, JUSTIN GEROME HORN, Appellant, prays that this Honorable Court, upon consideration of the record, the authorities, and arguments made herein, will find reversible error and will reverse the Judgment of conviction, and remand this cause with an acquittal, or alternatively,

for a new trial, and for such other and further relief to which Appellant may be entitled at law and equity.

Respectfully submitted,

___/S/ Hough-Lewis Dunn
Hough-Lewis ("Lew") Dunn
Attorney at Law
P.O. Box 2226
Longview, TX 75606
E-mail: dunn@texramp.net
Vox: 903-757-6711
Fax:  903-757-6712
Counsel for Appellant

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing "Brief for Appellant" has been sent by electronic transmission to the following on this 6th day of June, 2018:

Hon. John Roberts, Assistant Criminal District Attorney, Gregg County, Texas, at his e-mail address: john.roberts@co.gregg.tx.us.

___/S/ Hough-Lewis Dunn
Hough-Lewis ("Lew") Dunn

**CERTIFICATE OF COMPLIANCE**

I certify that the foregoing document complies with Rule 9, TEX. R. APP. PROC., regarding length of documents, in that exclusive of caption, identity of parties and counsel, statement regarding oral argument, table of contents, index of authorities, statement of the case, issues presented, statement of jurisdiction, statement of procedural history, signature, proof of service, certification, certificate of compliance, and appendix, it consists of 6,922 words.

/s/ Hough-Lewis ("Lew") Dunn
Hough-Lewis ("Lew") Dunn